IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BRENDA DIGNAN,

        Plaintiff,

      v.                                   Civil Action No. 2:04-CV-78

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
             Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    <u>Background</u>

Plaintiff, Brenda Ann Dignan (Claimant), filed her Complaint, <u>pro se</u>,[1] on October 18, 2004,

seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[2] Commissioner filed her Answer on January 10,

2005.[3] Claimant filed her Legal Argument of Federal Plaintiff on February 2, 2005.[4] Commissioner

filed her Motion for Summary Judgment and Memorandum in Support on February 23, 2005.[5]

---

[1]  However, "Plaintiffs Response to Defendants Motion for Summary Judgment" [sic] appears to have been written by someone with some legal training, notwithstanding the numerous grammatical errors.  The Court may want to inquire who is acting as a lawyer for Claimant, but not appearing.

[2] Docket No. 1.

[3] Docket No. 7.

[4]  Docket No.  9.

[5] Docket Nos. 10, 11.

Claimant filed her Response to Motion for Summary Judgment on March 16, 2005.[6]

B.    The Pleadings

1.    Claimant's Legal Argument of Federal Plaintiff.[7]

2.    Commissioner's Motion for Summary Judgment and Memorandum in Support.[8]

3.    Claimant's Response to Motion for Summary Judgment.[9]

C.    Recommendation

1.    I recommend that Claimant's Legal Argument of Federal Plaintiff, which is in the nature of a Motion for Summary Judgment, be DENIED and Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ (1) properly considered Claimant's treating and examining physicians' opinion; (2) gave proper weight to the state agency physicians; and (3) properly determined Claimant's RFC. Additionally, Claimant's additional evidence, which was submitted with her motion, does not warrant a remand. Finally, Claimant's claim of ineffective assistance of counsel is without merit.

## II. Facts

A.    Procedural History

On March 14, 2002, Claimant filed an application for a Period Disability and Disability

---

[6] Docket No. 13.

[7] Docket No. 9.

[8] Docket Nos. 10, 11.

[9] Docket No. 13.

Insurance Benefits alleging disability since February 16, 2001.[10] The application was denied initially and on reconsideration. A hearing was held on June 9, 2003 before an ALJ. The ALJ's decision, dated July 24, 2003, denied the claim finding Claimant not disabled within the meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on August 20, 2004. This action was filed and proceeded as set forth above.

B.    Personal History

Claimant was 54 years old on the date of the June 9, 2003 hearing before the ALJ. Claimant has a high school equivalency degree and past work experience as a bartender, home health care aide, sales clerk and office clerk.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: February 16, 2001–July 24, 2003.

**Agency Reporting Form Physical, 05/08/02, Tr. 100-102**
DIAGNOSIS: Chronic neck pain, status post fusion

**Potomac Valley Hospital, History & Physical Examination, 01/22/02, Tr. 107-108**
ASSESSMENT: Chronic neck pain status post fusion

**Physical Residual Functional Capacity Assessment, 05/16/02, Tr. 109-116**
EXERTIONAL LIMITATIONS: occasionally lift and or carry 50 pounds, frequently lift and or carry 25 pounds, stand or walk (with normal breaks) about 6 hours in an 8-hour workday, sit (with normal breaks) about 6 hours in an 8-hour workday

**Psychiatric Review Technique, 05/17/02, Tr. 117-130**
FUNCTIONAL LIMITATION: Mild restriction of activities of living daily, mild difficulty in maintaining social functioning, mild difficulty in maintaining concentration, persistence, or pace

---

[10]    Claimant previously filed an application for DIB. The claim was denied initially and on reconsideration. She filed a Request for a Hearing. On February 16, 2001, an ALJ denied her application. Plaintiff filed a request for review with the Appeals Council. On September 5, 2001, the Appeals Council denied her request for review. Plaintiff did not appeal this decision.

**Ability to do work related activities, Dr. Thomas Johnson, 08/13/02, Tr. 134-138**
ABILITY: Can carry less than 10 pounds maximum on an occasional basis, can carry less then 10 pounds maximum on a frequent basis, Can stand or walk less than 2 hours maximum on a normal work day, can sit less than 2 hours maximum on a normal work day, can sit 5 minutes before changing position, can stand 5 minutes before changing position, patient must walk around every 5 minutes for 5 minutes to relieve discomfort
ENVIRONMENTAL RESTRICTIONS: avoid all exposure to extreme cold, extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, poor ventilation, and hazards.

**Laboratory Corporation of America, Hemoglobin Alc, 02/19/2003, Tr. 164**
Result: Alc high (6.2H)% should be 4.5-5.7

**Garrett County Memorial Hospital, Tests results, 02/19/2003, Tr. 165**
RESULTS: HDL is low (34) should be 35-85 MG/DL

**Garrett County Memorial Hospital, Test results, 08/14/2002, Tr. 167**
RESULTS: Cholesterol is high (429) should be 75-200 MG/DL, Triglyceride is high (973) should be 11-175 MG/DL, HDL is low (34) should be 35-85 MG/DL

**Garrett County Memorial Hospital, Test results, 11/08/2002, Tr. 168**
RESULTS: Cholesterol is high (222) should be 75-200 MG/DL, Triglyceride is high (355) should be 11-175 MG/DL, HDL is low (31) should be 35-85 MG/DL

**Garrett County Memorial Hospital, Test results, 12/27/2002, Tr. 170-171**
RESULTS: Glucose is high (129) should be 60-120 MG/DL, Mean Corpuscular HGC is low (32) should be 32-37 G/DL, Basophil is high (1.06) should be .2-1%

**Garrett County Memorial Hospital, Test results, 6/18/2002, Tr. 173**
RESULTS: Cholesterol is high (616) should be 75-200 MG/DL, Triglyceride is high (1553) should be 11-175 MG/DL, HDL is low (34) should be 35-85 MG/DL, calcium is high (10.1) should be 8.2-10 MG/DL, Thyroxine is low (4.6) should be 4.7-12.7 UG/DL, TSH is high (11.542) should be .030-4.500 UIU/ML

**Garrett County Memorial Hospital, Test results, 10/04/2002, Tr. 174**
RESULTS: ISH is high (52) should be 1-40 IU/L, Cholesterol is high (209) should be 11-175 MG/DL

**Garrett County Memorial Hospital, Test results, 06/18/2002, Tr. 175**
RESULTS: Polymorphonuclear is low (37.8) should be 45-70%, Basophil is high (1.57) should be .2-1%, Monocyte is low (3.46) should be 5-15%, Lymphocyte is high (55.6) should be 20.5-45.5%

**Garrett County Memorial Hospital, Radiology Report, 1/22/2003, Tr. 178**
IMPRESSION: scimitar syndrome, minimal linear atelectasis or scarring of the right lung base,

mild soft tissue fullness in the anterior mediastinum and prominent lymph nodes in the middle mediastinum

**Garrett County Memorial Hospital, Radiology Report, 1/22/2003, Tr. 179**
IMPRESSION: Decreased perfusion involving the cardiac apex and adjacent anterior septal wall on both the stress and rest images. This actually appears worse on the rest images and is not exclusive of reverse redistribution which can be associated with coronary artery disease. Clinical correlation should guide further evaluation.

**Garrett County Memorial Hospital, Radiology Report, 12/27/2002, Tr. 180**
IMPRESSION: Volume loss in the right lower lung could be due to air space disease in that area. However, on lateral radiography, no abnormalities are seen. This may be a chronic finding. Basilar opacity at the left cardiophrenic angle most likely represents a cardiac fat pad.

**Houston Healthcare Complex, PCI Radiology Report, 03/28/2001, Tr. 184-185**
IMPRESSION: Degenerative disc disease at the L3-4 through LF-S1 levels. Partial Sacralization of the transverse processes of L5. Facet joint arthropathy at the L5-S1 level bilaterally.

**Central Georgia Cardiac Care, 10/07/1999, Tr. 186**
IMPRESSION: probably normal dual isotope perfusion study, specificity reduced due to soft tissue attenuation, clinical correlation is required

**New Patient Evaluation, 01/09/1998, Tr. 188-189**
DIAGNOSTIC IMPRESSION: History of PSVT, recurrent episodes of palpitations and heart racing, COPD with asthmatic bronchitis, active smoking, dextrocardia

**Georgia Pain Institute, LLC, 06/06/2001, Tr. 190-191**
IMPRESSIONS: Cervical Post-laminecromy syndrome, overlying myofascial pain

**Georgia Pain Institute, LLC, 04/17/2001, Tr. 192**
IMPRESSIONS: Cervical Post-laminecromy syndrome, overlying myofascial pain, possible ruptured disc, LS spine

**Georgia Pain Institute, LLC, 03/05/2001, Tr. 194-195**
IMPRESSIONS: Cervical Post-laminecromy syndrome, overlying myofascial pain

**Georgia Pain Institute, LLC, 12/07/2000, Tr. 196-197**
IMPRESSIONS: Cervical Post-laminecromy syndrome, overlying myofascial pain

**Georgia Pain Institute, LLC, 10/27/2000, Tr. 198-199**
IMPRESSIONS: Cervical Post-laminecromy syndrome, overlying myofascial pain

**Georgia Pain Institute, Office Note, 02/24/99, Tr. 209-214**
IMPRESSION: Myofascial pain syndrome.

MEDICAL RECORDS ALLEGED LOST OR MISFILED

**Coliseum Medical Centers, Dr. Dasher, 01/07/1997**
IMPRESSION: herniated cervical disc with spondylosis C3-4, possible tendonitis/bursitis right shoulder

**Georgia Pain Institute, Dr. Earls, 07/14/1999**
IMPRESSION: Myofascial pain syndrome involving the cervical paravertebral, right upper extremity musculature and mild involvement of the lumbosacral paravertebral musculature. Cervical post-laminectomy/fusion syndrome. Cervical radiculopathy involving the right upper extremity. Dysphagia, which may be associated with the Synthes instrumentation from her previous anterior cervical disc fusion. Dizziness with movement of her head with recent investigation, which was apparently focused on her history of weight loss and dizziness. History of dextrocardia.

**Middle Georgia Hospital, Dr. Carlos Giron, 10/20/1999**
PREOP DIAGNOSIS: Myofascial pain syndrome, involving the aforementioned muscle groups, cervical radiculopathy of the right upper extremity, cervical post-laminectomy/fusion syndrome, history of dysphagia, history of dextrocardia
IMPRESSION: Myofascial pain syndrome, involving the aforementioned muscle groups, cervical radiculopathy of the right upper extremity, cervical post-laminectomy/fusion syndrome, history of dysphagia, history of dextrocardia, recent hysterectomy

**Middle Georgia Hospital, Dr. Carlos Giron, 10/22/1999**
PREOP DIAGNOSIS: Myofascial pain syndrome, involving the aforementioned muscle groups, cervical radiculopathy of the right upper extremity, cervical post-laminectomy/fusion syndrome, dysphagia, dextrocardia, history of recent weight loss
IMPRESSION: Myofascial pain syndrome, involving the cervical paravertebral musculature, cervical radiculopathy of the right upper extremity, cervical post-laminectomy/fusion syndrome, dysphagia, history of dextrocardia, recent hysterectomy
**Middle Georgia Hospital, Dr. Carlos Giron, 10/28/1999**
PREOP DIAGNOSIS: Myofascial pain syndrome, involving the cervical paravertebral musculature, cervical radiculopathy of the right upper extremity, cervical post-laminectomy/fusion syndrome, dysphagia, dextrocardia, ongoing weight loss
IMPRESSION: Myofascial pain syndrome, involving the cervical paravertebral musculature, cervical radiculopathy of the right upper extremity, cervical post-laminectomy/fusion syndrome, dysphagia, dextrocardia, ongoing weight loss

**Georgia Pain Institute, Dr. Earls, 10/27/2000**
IMPRESSIONS: cervical post-laminectomy syndrome, overlying myofascial pain

**Georgia Pain Institute, Dr. Earls, 12/07/2000**
IMPRESSIONS: cervical post-laminectomy syndrome, overlying myofascial pain

**Georgia Pain Institute, Dr. Earls, 03/05/2001**
IMPRESSIONS: cervical post-laminectomy syndrome, overlying myofascial pain

**Georgia Pain Institute, Dr. Earls, 04/17/2001**
IMPRESSIONS: cervical post-laminectomy syndrome, overlying myofascial pain, Possible ruptured disc, LS spine

**Georgia Pain Institute, Dr. Earls, 06/06/2001**
IMPRESSIONS: cervical post-laminectomy syndrome, overlying myofascial pain

**Houston Medical Center, Dr. Agulia, 11/09/1996**
IMPRESSION: SVT, rule out bronchitis

**Houston Healthcare Complex, Radiology Report, 11/09/1996**
IMPRESSION: A dextrocardia with what appears to be hypoplasia of the right lung an anomalous pulmonary venous return that appears to drain from the right lung to below the diaphragm consistent with scimitar syndrome (partial anomalous pulmonary venous return).  Consultation with a Cardiologist is highly recommended.

**Houston Medical Center, Dr. Agulia, 11/10996**
IMPRESSION: supraventricular tachy-arrhythmias, bronchitic, chronic tobacco use, anomalous pulmonary venous return by chest x-ray

**Houston Heart Institute, Echocardiogram Report, 11/11/1996**
CONCLUSIONS: dextrocardia, normal left ventricular function, no passage of air contrast from right atrium to left atrium or right ventricle to left ventricle

**Houston Healthcare Complex, Radiology Report, 1/121996**
IMPRESSION: essentially normal study with no evidence of pharmacolobically stress induced reversible ischemia of the left ventricular myocardium

**Houston Healthcare Complex, Exercise Stress Test Report, 11/12/1996**

CONCLUSIONS: clinically and electrically negative, sestamibi images pending

**Houston Medical Center, 11/09/1996**

ADMISSION DIAGNOSIS: supraventricular tachycardia, acute bronchitis

DISCHARGE DIAGNOSIS: supraventricular tachycardia, acute bronchitis, dextrocardia

**Dr. Aguila, 02/03/1997**

IMPRESSION: Acute sinusitis

**Dr. Aguila, 02/25/1997**

IMPRESSION: Acute Bronchitis

**Dr. Aguila, 10/08/1997**

IMPRESSION: pharyngitis

**Dr. Aguila, 03/27/1998**

IMPRESSION: ruptured disc

**Dr. Aguila, 09/08/1998**

IMPRESSION: diabetes mellitus

**Dr. Aguila, New Patient Evaluation, 01/09/1998**

DIAGNOSTIC IMPRESSION: history of PSVT, recurrent episodes of palpitations and heart racing, COPD with asthmatic bronchitis, active smoking, dextrocardia

**Houston Healthcare Complex, Radiology Report, 03/27/1998**

CONCLUSION: stable radiographic findings with no acute cardiopulmonary disease process noted

**Dr. Aguila, 07/20/1998**

DIAGNOSTIC IMPRESSION: paroxysmal supraventricular tachycardia, controlled with beta-blockers, COPD-stable, active smoking, diabetes mellitus Type II on oral hypoglycemics, dextrocardia

**Dr. Agulia, 07/19/1999**

IMPRESSION: Microcalcifications left breat & BPPV

**Dr. Agulia, 08/05/1999**

IMPRESSION: BPPV

**Central Georgic Card?, Dr. Kazi, 10/07/1999**

IMPRESSION: negative treadmill stress test.  No evidence of exercise (illegible).  And a maximum heart rate of 137

**Dr. Agulia, 11/02/1999**

DIAGNOSTIC IMPRESSION: palpitations, history of paroxysmal supreventricular tachyarrhythmais, asthma

**Dr. Agulia, 02/03/2000**

DIAGNOSTIC IMPRESSION: palpitations, history of paroxysmal supreventricular tachyarrhythmais, asthma

**Dr. Agulia, 12/28/2000**

IMPRESSION: cervical pain & COPD & palpitations

**Dr. Agulia, 03/12/2001**

IMPRESSION: SI Radiculopathy

**FDRAD/Lumbar spine with obligue, report, 03/29/2001**

IMPRESSION: Degenerative disc disease at the L3-4 through LF-S1 levels. Partial Sacralization of the transverse processes of L5. Facet joint arthropathy at the L5-S1 level bilaterally.

**Dr. Agulia, 04/02/2001**

IMPRESSION: L5-S1 Radiculopathy

**WMRI/MRI Lumbar spine w/o contr, results, 04/09/2001**

IMPRESSION: left paracentral disc extrusion with mild inferior migration of disc material at the L4-5 level. There appears to be some mild impingement on the left L5 nerve root.

**Dr. Agulia, 04/12/2001**

IMPRESSION: HNP


D.      Testimonial Evidence


1. Claimant


Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 215-252):


Q       - - and since February 16 of 2001, what's your pain level been on a scale from one

to 10?  10 being the - -


A       Highest.


Q       - - most pain with pain that would take - -


A       It averages about eight.


Q       Eight.  Okay.  And that's been for that period of time, okay.


A       Um-hum.


Q       All right.


A       That's been from the time of the accident.


                        *               *               *

Q        And do you still have those problems with fatigue?

A        Yeah, constantly with that.  That's why my husband was saying I, you know - -

Q        How does that affect you during your day?

A        Well, like, you know, if I stand up for too long a period of time I get very weak.

Q        How long would you say would be a very long time?

A        Sometimes 30 minutes.  Sometimes I can last an hour.  And when I got up one morning and - - you know, I rose - - in there getting dressed, and I got very weak, and I almost passed out.

*                *                *

Q        Well, how frequently do you think you lay down?

A        Oh, probably - - I know at least 60 to 70 percent of the time. I'm not up very much.  I mean, I can't.  If I start, I start getting weak, you know.  It's like I got up and got dressed to go to church, and my husband had to end up carrying me in to church, you know, because I couldn't - - I've gotten - -

Q        Would you say that's just not very ordinary, or is that - - was that usually what the situation was?

A        That happens pretty frequently.

*                *                *

ALJ            Okay.  All right.  I'll take that.  At different periods of time, though, did

that pain improve, or has it remained constant for you throughout?

CLMT        It's really - - it's constant unless I'm, you know, laying down or I'm

asleep.

ALJ         Okay.

CLMT        Because I can't lay on my back or my - - I can't even lay on my left side

any more.  When I'm laying down - -

ALJ         Um-hum.

CLMT        - - I can only lay on my right side.  And that runs into a problem because

my right arm got hurt during a - - when they were doing physical therapy on me from - - after my

neck surgery.

ALJ         Okay.

CLMT        And I - - but if I lay on my back, my back hurts me.  If I lay on my left

side, I get dizzy.  I mean, I'm like - - my husband said I don't move after I go to sleep.

ALJ         Yeah.  The only - -

CLMT        I wake up sore.

### 2. Claimant's Husband

Testimony was taken at the hearing from Claimant's husband, who testified as follows

(Tr. 252-261):

Q       Is she able to do anything in the house at all?

11

A       She can do minor housework.

Q       Okay.

A       No - - you know, nothing heavy really.  I do the vacuuming.  My grandson does the dusting.

Q       Okay.

A       With anything cooking, if there's, you know, if there's a heavy pan or a pot, I have to lift it off the stove, things of this nature.

Q       All right.  Anything else in the way of activities that she does?

A       Well, she does a little bit of sewing on occasion, you know, just minor stuff.  She can't get involved in anything.

Q       Okay.

A       Just repair of something or - -

Q       Is she able to drive a car?  Is she able to get out of the house?

A       She can drive, but she can't drive very far.  And because of her medication, she shouldn't be driving anyhow.

Q       Okay.  And have you brought that to the attention of the Department of Motor Vehicles?  Have you talked to her about giving up her license?

A       We haven't really considered it yet.  No.

*               *               *

A       Well, she'll do some of the dishes.  The grandson usually does the dishes.

Q       All right.  How about the - -

A       The laundry - - I carry it out, and she'll sort it.  Then we'll put it in the - -

Q       Okay.

A       - - laundry.  I carry it into the couch or wherever, and we fold it.

Q       She watch any TV?  What else does she do?

A       TV.  A little bit of time on the computer, but not much.

Q       Okay.  What's she do on the computer?

A       She does some computer shopping.  And sometime just enjoyment, you know,

going to different web sites to learn something or - -

Q       Okay.  And any other activities that you can think of?  She takes care of Nory, I'm

sure, and Keela.

A       She likes to go out in the yard a little bit, but, you know, she can't do much out

there.  I - - she supervises my putting flowers in the ground or - -

Q       Okay.  She still doing the floral arrangements?

A       She does some.  Yes.

Q       Okay.

A       But she's not into it for business.  It's just strictly for home use.

Q       All right.  How often does she do those - - those floral arrangements?

A       Oh, she might spend an hour a week on it.

                    *               *               *

A       She can walk, but not very far.  She has to stop and rest for a few minutes.

Q       Okay.  On a clear day, flat, level surface, how far can she walk?

A       Oh, probably 100 yards - -

Q       Okay.

A       - - at one time without, you know, pain or anything.  After that, she'd have to sit

down.  And then - -

Q       And how long can she stand just before she has to sit down?

A       Usually, I've noticed after about 20 minutes she starts complaining of either her

shoulder burning, and her neck, or the lower back because of an injury there.

Q       Okay.  How about sitting?  How long can she sit before she has to - -

A       She usually starts squirming in 20, 25 minutes at the most.

                    *               *               *

Q       Okay.  Do you have any observations as to how she's been affected by her heart

problems?

A       Well, if she gets overly tired or excited she has a - - she can feel a flutter coming

on.  And she usually has to sit down or lie down or it will supposedly get real bad.  I don't know.

I've never seen it happen, you know, to the point that she had to be hospitalized.

Q     But has she - -

A     I have seen it come on.  And she gets pale and dizzy.

Q     How often has that happened?

A     I've seen that twice.  And both times she was pressing herself a little bit on whatever activity she was doing at the time.  I really don't remember what it was.

Q     Now, when you're at home - - does she spend any time laying down at home?

A     Yes.  She lays down or goes back in the recliner - - full recline - - at least three times a day.

Q     For how long?

A     Oh, 15, 20 minutes.  She has taken a nap for an hour - -

Q     Okay.

A     - - hour and a half.

Q     Now, is that pretty regular, as far as having to get into a recliner?

A     Oh, she goes - - she used the recliner at least two or three times a day for a half-hour or so.

Q     Okay.

A     I mean, full recline.

Q     All right.  And now, you've only - - you've been married to her since 2001.  How long have you known her?

A    I met her in March of 2001 on the computer.

Q    Okay. In that period that you've had a chance to live with her, why do you - - and you know that she's here today trying to get Social Security disability benefits - - do you have any opinion as to why you believe she cannot work?

A    I don't think she could handle a full day out there without injuring herself or someone else because of her medications or - -

Q    Okay, sir. Thank you.

A    I think even - - she - - there would be some mental stress there.

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 261-269):

Q    And would you describe for me a vocational standpoint the Claimant's past relevant work activity, discuss the physical and mental requirements, any skill levels that you find, any transferability of skills that might exist?

A    Yes, sir. The work as a bartender, routinely performed in the national economy, is a light duty, semiskilled job. However, based on her testimony of the lifting requirements, I would reclassify that to a medium duty, semiskilled job. Work as a nursing assistant, also medium duty, semiskilled. Work as a sales clerk, light duty, unskilled.

Q    Okay. And what I'd like you to do is to assume the following. Assume that frequently is 1/3 to 2/3 of an eight-hour day, occasionally is a little up to 1/3 of an eight-hour day, that moderate is defined to be at a level of severity that would preclude the attention and

concentration required for the high stress, production oriented type of work, and also complex work, but not a level of severity or magnitude to preclude less stressful work of an unskilled or semiskilled nature involving performance of simpler work instructions. I define the term simpler as it is customarily used in normal work rules. I am in no way referring to sheltered workshop type work. The balancing I'm referring to is normal balancing, not balancing as part of a work criteria. What I'd like you to do is to run ranges for me for individuals who are of a medium, light, and sedentary, for an individual that has a date of birth of May 24, 1949. I'm going to give you a range of hypotheticals so that I can go back and look at the new exhibits. And I do have to go back and look at those because I didn't get the chance to do those - -

ATTY  - -    As well as the - - Your Honor - - like it should be - - the records of Dr. O'Keefe.

ALJ    Yeah. And try to get me that within the next week if you can.

ATTY    I will, Your Honor.

BY ADMINISTRATIVE LAW JUDGE:

Q    Assume that the ability to perform at those ranges is limited by the following. No climbing of ladders, ropes, and scaffolds, no hazardous heights, no hazardous moving machinery, no exposure to extreme temperature changes. Assume that we have an individual that requires low stress, routine type of work and other work requiring no more than moderate attention and concentration for prolonged periods. Assume that in the first hypothetical that - - assume that the individual can occasionally climb stairs and ramps and occasionally balance and stoop and kneel and crouch, no crawling. Assume also that no concentrated exposure to dust, fumes, chemicals,

poor ventilation, or excessive humidity, or excessive wetness, or vibration. Put the pain at moderate with moderate limitations in the first hypothetical with regard to performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances, and also the work and coordination are approximately those without distracting them or being distracted by them. When you get to #2, make it more restrictive. Preclude work that requires as apart of the work criteria kneeling and crouching. #2 also, no above the shoulder, upper extremity lifting or carrying. And #3, make it - - well, part of #2 - - no lower extremity use of push/pull controls. When you get to #3, make it more restrictive to the extent of the need to avoid moderate exposure to dust, fumes, chemicals, poor ventilation, or excessive humidity, or excessive wetness, or vibration. But I'm not - - but not requiring any sanitized environment. Can still work, you know, but - - when you get to #4, make no prolonged walking, standing, and make a sit/stand option with no more than a half an hour sitting or standing at any one time period. When you get to five, make it a sit/stand option at the individual's sole discretion. And six, elevate to above moderate to severe the pain level and/or the non-exertionals that I presented to you in the first five hypotheticals. And that'll give me a range of hypotheticals to work from. Let's see if I want to make any adjustments. In three, add in there slight to no more than moderate to a completely normal workday or workweek without any reasonable length to a number of rest periods. And then when you get down to #6, elevate that to above moderate to severe on a chronic daily basis. Okay. You can go ahead and address those hypotheticals for me. I'd like you to assume a local range of 50 to 75 miles from the hearing site. And if you find work - - I'm not asking you to find it, but if you do, tell me whether or not that work is consistent with the Directory of Occupational Titles. Also, if the work involves a sit/stand option, please inform

me whether or not that's based upon your knowledge and experience.  And you can begin, Mr. Lester, any time you're ready.

A        Yes, sir.  Medium duty, unskilled work, addressing hypothetical #1.  Medium, unskilled work available for such an individual would include work such as hospital cleaner, 150,000 nationally, 200 locally.

Q        Let's - - the hospital cleaner.  Wouldn't that involve being necessarily in a hospital environment, involving dealing with chemicals and - - can you give me another position - -

A        Sure.

Q        - - other than that?

A        Sure.  Not a problem.  The laundry work.

Q        Laundry worker, okay.

A        There are 74,000 nationally.

Q        Okay.

A        350 locally.

Q        All right.

A        Work as a kitchen helper.  79,000 nationally, some 1,000 locally.

Q        Okay.

A        And work as a sandwich maker.  45,000 nationally, some 400 locally.

Q        Okay.

A        Those are medium duty, unskilled positions.  Light duty, unskilled work would

include work as a Cashier II, 138,000 nationally, 1,500 locally.  Work as an assembler,

particularly small products assembly done in a bench type setting, 76,000 nationally, some 350

locally.  And general office work/office helper, 180,000 nationally, some 500 locally.  Sedentary,

unskilled work would include administrative support work, such as an addresser, 45,000

nationally, some 300 locally.  Work as a callout operator, 60,000 nationally, some 300 locally.

And final assembly work, 60,000 nationally, some 350 locally.

Q      What was the last one - - the last position?

A      Final assembly.

Q      Final assembly, okay.  Any significant changes with #2?

A      I think it would reduce the medium work by 25 percent.

Q      Okay.  How about #3?

A      I don't think there would be any additional changes - -

Q      Okay.

A      - - with #3. #4 would eliminate the medium work and reduce the light by 10

percent. #5 would reduce the light by an additional 10 percent.  And #6, there would be no work

for such a hypothetical individual.

Q      No work at all.

A      Yes, sir.  And all of those jobs noted are in fact consistent with the Dictionary of

Occupational Titles, with the exception of the sit/stand option.  Based on my knowledge and

experience in the workplace, understanding of work rules, job tasks, and functions, that is

employers typically provide for such an opportunity.

Q        And there's an assessment I want to refer you to, or counsel can refer you to.

ALJ        Do you have a copy of that, Counsel?

ATTY        I do.

ALJ        It's #7F.  Could you look at Exhibit 7F for me, if you will?  I haven't had a chance to do too much with that.  But if you look at Exhibit #7F, review that for me, and tell me the result of the limitations that are set in Exhibit 7F.  And that's from Dr. Johnson, right, Counsel?

ATTY        That's correct, Your Honor.

VE        Addressing that exhibit, I think based on the combination of limitations it would be less than sedentary and no work would be available.

E.        Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

•        Goes to church every Sunday.  (Tr. 227).

•        Has a driver's license (Tr. 228).

•        Does some sewing (Tr. 229).

•        Goes shopping with her husband. (Tr. 229).

•        Watches televison, especially NASCAR races.  (TR. 229).

• Does light dusting, dishes, on occasion. (Tr. 230).

• Reads cooking magazines. (Tr. 231).

• Can stand for up to an hour and a half. (Tr. 244).

• Can sit for one half hour (Tr. 2 46-247).

• Can walk 100 yards. (Tr. 256).

• Smokes a pack of cigarettes a day. (Tr. 257).

• Sometimes naps for an hour and a half. (Tr.260).

### III. The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred: (1) in failing to correctly analyze the medical record and afford proper weight to Dr. Johnson's opinion; and (2) in determining Claimant's RFC. Additionally, Claimant alleges that the ALJ's decision is not supported by substantial evidence in light of new evidence submitted by Claimant with her motions that was not previously submitted because it was "misfiled" or "lost." Finally, Claimant alleges that she should be awarded benefits due to ineffective assistance of counsel.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ (1) properly analyzed the medical evidence and properly accorded no weight to Dr. Johnson's opinion; and (2) properly determined Claimant's RFC. Additionally, Commissioner contends that, because the additional evidence provided by Claimant

is not new and would not have changed the ALJ's decision, the case should not be remanded. Finally, Commissioner contends that this case should not be remanded due to alleged ineffective assistance of counsel.

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review. Only a final determination of the Commissioner may receive judicial review. See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    Social Security - Medically Determinable Impairment. The Social Security Act

requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5. <u>Disability Prior to Expiration of Insured Status- Burden</u>. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6. <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7. <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8. <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

10. <u>Evidence - Weight</u>. The ALJ is required to indicate the weight given to all relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231 (4th Cir. 1984). However, the ALJ is not required to discuss every piece of evidence. <u>Green v. Shalala</u>, 51 F.3d 96, 101 (7th Cir. 1995).

11. <u>Social Security - Treating Physician - Opinion that Claimant is Disabled</u>. An opinion that a claimant is disabled is not a medical opinion within the definition of 20 C.F.R. §§ 404.1527, 416.927. A statement by a medical source that Claimant is disabled or unable to work does not mean that the Commissioner will determine that Claimant is disabled. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). The Commissioner is responsible for making the determination whether a claimant meets the statutory definition of disability. <u>Id.</u> No special significance will be given to the source of an opinion on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).

12. <u>Social Security - Treating Physician - Controlling Weight</u> - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence

in the case record.  20 C.F.R. § 416.927(d)(2).  <u>See also</u>  <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984); <u>Heckler v. Campbell</u>, 461 U.S. 458, 461 (1983); <u>Throckmorton v.  U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir.  1990).

13.     <u>Social Security - Treating Physician - Speculative Opinion</u>.  An ALJ is not bound to accept the opinion of a treating physician which is speculative and inconclusive.  <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

14.     <u>Social Security - Treating Physician - Not Entitled to Controlling Weight</u>.  When not entitled to controlling weight, the medical opinion of a treating physician is still entitled to deference and must be weighed according to the following five factors: 1) length of the treatment relationship and frequency of examinations, 2) nature and extent of the treatment relationship, 3) supportability, 4) consistency, and 5) specialization.  20 C.F.R. §§ 404.1527(d), 416927(d).  When benefits are denied, the ALJ must give good reasons in the notice of decision for the weight given to a treating source's medical opinion(s).  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

15.     <u>Social Security - Claimant's Credibility - Pain Analysis</u>.  The determination of whether a person is disabled by pain or other symptoms is a two step process.  First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged.  Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record.  <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996).

16.     <u>Social Security - Vocational Expert - Hypothetical</u>.  In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the

record and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989).  The ALJ is afforded "great latitude in posing hypothetical questions," Koonce v. Apfel, No. 98-1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)[11], and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations.  Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988).

17.  <u>Social Security - Vocational Expert - Hypothetical - Claimant's Counsel</u>.  Based on the evaluation of the evidence, an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ.  France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir.1986)).

18.  <u>Social Security - New Evidence -Remand - Burden on Claimant</u>.  "A claimant seeking remand on the basis of new evidence under 42 U.S.C. § 405(g) must show that the evidence is new and material and must establish good cause for failing to present the evidence earlier.  Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 96 (4th Cir. 1991) (en banc).

19.  <u>Social Security - New Evidence - Power to Remand</u>.  The Court may remand a case to the Commissioner "only upon a showing that there is new evidence, which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); Borders v. Heckler, 777 F.2d 954 (4th Cir. 1985).

---

[11] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

C.    Discussion

### 1.  The ALJ erred in disregarding Dr. Johnson's opinion.

Claimant asserts that the ALJ improperly evaluated the opinion of Dr. Johnson, Claimant's treating physician.   Commissioner counters that the ALJ properly accorded no weight to Dr. Johnson's work capacities assessment.

It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner.  Id.   The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. §416.927(d)(2).  See also,  Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir.  1990).

In this case, the ALJ considered Dr. Johnson's work capacities questionnaire, dated August 12, 2002 and completed at the request of Claimant's attorney, and found that  Dr. Johnson's assessment  cannot be accorded controlling weight because his opinion was not supported by the medical evidence.   (Tr. 16-17).  Specifically, the ALJ noted that, although Dr. Johnson's opinion was based on Claimant's cervical and lumbar spine disease, his records did not indicate that he had been treating Claimant for these impairments.  (Tr. 17, 135-138, 148-161).

Dr. Johnson also opined that Claimant had these limitations since 1997; however, he first evaluated Claimant only in June of 2002. (Tr. 17, 138, 161).

Additionally, the ALJ noted that Dr. Johnson's opinion was inconsistent with other substantial evidence in the case record. In his decision, the ALJ noted that "there is simply no viable correlation between the extreme limitations listed by Dr. Johnson and any of the clinical and/or laboratory diagnostic findings reported by himself, by Dr. Santiago, or by Dr. Rodriguez, Dr, Khazi, or Dr. Earls in Georgia prior to the claimant's move to Georgia in August 2001." (Tr. 17). For example, in March 2001, Claimant's X-ray of the lumbar spine demonstrated degenerative disc disease at L3-4 through L5-S1 levels, with partial sacralization of the transverse processes of L5 and facet joint arthropathy at the L5-S1 level, bilaterally. (Tr. 184). In April 2001, an MRI demonstrated some mild impingement of the left L5 nerve root. (Tr. 213). The Georgia Pain Institute records indicated that Claimant had no atrophy and 5/5/ strength throughout, except for the proximal right upper extremity, which was 4+/5. (Tr. 196, 208. 211). In June 2001, Claimant was doing "quite well," her pain was a three with ten being the worst pain experienced, ans she stated that for the first time in may years, her pain was at a tolerable level,. (Tr. 189-190). At the time, Dr. Earls specified no functional restrictions. (Tr. 189-190). In January 2002, Dr. Santiago also specified no functional restrictions. (Tr. 108). In February 2002, Claimant was doing much better, denied any side effects, and was happy with the pain control. (Tr. 106). In May 2002, Dr. Santiago prepared a disability form and noted that Claimant had an abnormal range of motion in her neck and abnormal sensory deficits in her right lower extremity, but she had normal findings in all other areas. Dr. Santiago cited no functional limitations. (Tr. 101).

Therefore, because Dr. Johnson's August 12, 2002 opinion is inconsistent with other substantial evidence in the record, the ALJ did not err when he did not give controlling weight to the opinion of Dr. Johnson.

## 2. Opinion of Consulting Physicians

Claimant contends that the ALJ erred in relying on the medical opinions of the non-examining state agency physicians. Commissioner counters that the ALJ properly weighed and analyzed the medical opinions of record.

It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id. It is well established that an ALJ may rely on the opinions of non-examining physicians, even when those opinions contradict the opinion of a treating physician, if the opinions are consistent with the record. Gordon v. Schweiker, 725 F,2d 231, 235 (4th Cir. 1984).

In the instant case, the ALJ properly relied on the medical opinion of the State Agency medical consultants. The ALJ noted that both Dr. Brown and Dr. Simmons opined that Claimant could occasionally lift and carry fifty pounds, frequently lift and carry twenty-five pounds, stand/walk for about six hours, sit for about six hours, had unlimited push/pull ability, and had limited ability to reach in all directions (Tr. 110-13, 116). In fact, the ALJ found that Claimant had a more restrictive RFC, as the state-agency physicians failed to consider Claimant's myofascial pain syndrome and mild cardiovascular disease. (Tr. 17). Additionally, both Dr.

30

Marinelli and Dr. Roman opined that Claimant had only mild restriction of her activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and non episodes of decompression. (Tr. 17, 117, 127).

The ALJ did not accept medical findings or opinions based solely or primarily upon the Claimant's subjective complaints because of the above stated reasons. (Tr. 17). Therefore, the ALJ properly weighed and analyzed the medical evidence of record.

### 3. The ALJ erred in determining Claimant's Residual Functional Capacity

Claimant asserts that the ALJ erred in determining Claimant's Residual Functional Capacity (RFC). Commissioner counters that the ALJ properly determined Claimant's RFC.

A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. Id. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. Id.

With respect to Claimant's RFC, the ALJ determined as follows:

> For the period prior to date last insured and prior to June 13, 2003, the claimant's ability to perform the full range of the medium, light and sedentary

ranges as determined by Social Security Administration regulations would be diminished by the following: she can lift up to 25 pounds occasionally, and up to 50 pounds frequently (and alternatively at light 20 pounds occasionally and 10 pounds frequently and at sedentary 10 pounds or less). However, she should not climb ladders, ropes or scaffolds, or crawl, or be exposed to dangerous moving machinery or unprotected heights. She can occasionally climb stairs and ramps, balance and stoop, kneel and crouch, (no crawling); while experiencing moderate pain. She required low stress routine work (i.e. work that requires no more than moderate attention and concentration and persistence and pace for prolonged periods). Even though she can apparently tolerate smoking a pack of cigarettes each day, she should avoid work-pace exposure to dusts, fumes., chemicals, poor ventilation, excessive humidity or wetness, or excessive vibration. Due to her pain complaints, she has moderate limitations on performing activities within a schedule, maintaining regular attendance or being punctual within customary tolerances, and as to working in coordination with or proximity to others without distracting them or being distracted by them. For the period form June 13, 2003 and following, the claimant's residual functional capacity would be reduced as follows: light exertional work and a preclusion as to work requiring kneeling and crouching. (Tr. 20-21).

The ALJ determined Claimant's RFC based on the medical opinions of Claimant's physicians, as was discussed above, and Claimant's daily activities.[12] Although Dr. Johnson opined that Claimant could only stand for five minutes and sit for five minutes (Tr. 135, 244, 247), his opinion was inconsistent with the opinions of other physicians, which were discussed above. Moreover, during the hearing, Claimant stated that she can stand for up to an hour and a half and

_____

[12]Claimant's husband also testified that she smokes a pack of cigarettes each day. (Tr. 257). Claimant also argues that the transcript demonstrated that she was "confused and stressed," "probably" because of her medications. Pl.'s Response at 4. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984)(citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)). The ALJ did not note such "confusion and stress."

sit for one half hour. (Tr. 135-138). Although Claimant argues that the ALJ erred because he failed to acknowledge that she changed chairs during the hearing, the ALJ actually noted that Claimant testified that she could only sit for thirty minutes in an eight-hour day. (Tr. 12-14, 24-25). It is the duty of the ALJ to make factual findings and resolve conflicts in the evidence. Hayes, 907 F.2d at 1456. This Court cannot say that, in light of the evidence of record and the evidence outlined in the ALJ's decision, there was not substantial evidence for the ALJ's determination of Claimant's RFC. Therefore, the ALJ properly determined Claimant's RFC.[13]

### 4. New Evidence

Claimant also argues that the ALJ's decision is not supported by substantial evidence in light of additional evidence she submitted with her motion, which was "misfiled" or "lost." Commissioner argues that the case should not be remanded based on this additional evidence because it is not "new" within the meaning of 42 U.S.C. §405(g).

The Court may remand a social security case on the basis on newly discovered evidence, a "sentence six" remand, when the claimant satisfies four prerequisites. 42 U.S.C.A. §405(g) (2003); Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985). First, the evidence must be "new." Borders, 777 F.2d at 955 (holding "new" evidence is 'relevant to the determination of disability at the time the application was first filed and not merely cumulative'" (quoting Mitchell

---

[13] Claimant argues that the ALJ also mistakenly noted that Claimant engaged in hobbies two to three hours a day, rather than two or three hours a week. (Tr. 15, 80). The ALJ's findings were based on the totality of the record, and, in light of the evidence in the record, the Undersigned cannot say that there was not substantial evidence for the ALJ's determination of Claimant's RFC. Additionally, Claimant argues that the ALJ erred because he failed to mention that she should turn in her driver's license. However, the ALJ explained at the hearing that he believed that it was his duty to advise Claimant's husband that Claimant should turn in her driver's license if her husband did not believe that she should be driving. (Tr. 254).

v. Schweiker, 699 F.2d 185, 188 (4th Cir. 1983))). Second, it must be material. Id. Third, there must be good cause for the "failure to submit the evidence when the claim was before the Secretary." Id. Fourth, the claimant must make "'at least a general showing of the nature' of the new evidence." Id. (quoting King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979).

Evidence is not "new" if other evidence specifically addresses the issue. Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d at 96 (4th Cir. 1991). Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. Id.

It has long been settled that "[r]eviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence." Wilkins v. Secretary, DDHS, 953 F.2d 93, 96 (4th Cir. 1991)(en banc)(quoting Huckabee v. Richardson, 468 F.2d 1380, 1381 (4th Cir. 1972)(reviewing courts are restricted to administrative record in determining whether Commissioner's decision is supported by substantial evidence)). But when the evidence is submitted on judicial review which indicates that the Commissioner's "decision might be reasonably have been different," had he reviewed it as well, we should remand for reconsideration. King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979).

Claimant alleges that the following evidence was "lost" or "misfiled":

1.  Recommended Impairment Rating, dated 10/31/00;

2.  Georgia Pain Institute notes, dated 7/14/99; 10/5/99; 1/31/00; 4/14/00; 5/15/00; 6/13/00;7/13/00; 8/9/00; 10/27/00; 12/7/00; 3/5/01; 4/17/01; 6/6/01;

3.  Dr. Carlos Giron's notes, dated 10/20/99; 10/22/99; 10/28/99;

4. Dr. William Dasher's notes dated January 1998 through February 23, 1999.

5. Houston Medical Center's notes dated 11/9/96-11/12/96; 3/27/98;

6. Dr. Rafael Aguila's notes dated 2/3/97-3/4/98; 7/20/98; 7/19/99-12/28/99; 3/12/01; 4/2/01; 4/9/01; 4/12/01;

7. Coliseum Medical Centers' noted dated 4/5/98; and,

8. Dr. George Stefanis'notes dated 12/22/97-6/3/98.

Assuming arguendo, that Claimant has shown good cause for failing to present earlier the medical evidence, this evidence, nevertheless, does not require a remand. First, evidence is not "new" within the meaning of 42 U.S.C. 405(g). For example, Dr. Dasher's report is not new, as it references Claimant's anterior cervical discectomy and fusion at C3-4, which was addressed by the ALJ in his decision. (Tr. 15). Additionally, the Georgian Pain Institute's records are cumulative because many of them had been submitted or reference impairments that were addressed by other medical records.[14] With regard to Dr. Aguila's records, the ALJ considered Claimant's lumbar MRI dated April 9, 2001, which indicated that Claimant had some "mild" impingement of the left L5 nerve root. (Tr. 15). In this regard, the ALJ noted that the record did not"indicate that the claimant had any EMG or nerve conduction studies that confirmed any lumbar radiculopathy." (Tr. 15). Moreover, this new evidence is not "material" because it would not have reasonably changed the ALJ's decision. The majority of the documents predate Claimant's alleged date of disability of February 16, 2001. With respect to the records that fall within the alleged disability period, the records would not have changed the ALJ's decision.

---

[14] Claimant claims that the following records were "lost" or "misfiled": 1/31/00; 4/14/00; 5/15/00; 6/13/00;7/13/00; 8/9/00; 10/27/00; 12/7/00;

Specifically, the Work Horizons' October 2000 document does not support Claimant's claim, as it stated that there was inconsistent testing and Claimant had only a ten percent whole person disability. Also, although an April, 2001 MRI indicates that Claimant has a left paracentral disc extrusion with mild inferior migration of disc material at the L4-5 level, the ALJ had already considered Dr. Earl's April 17, 2001 report that stated Claimant had a possible ruptured disc. (Tr. 192). With regard to Dr. Aguila's records, although his note dated March 12, 2001 states that Claimant was barely able to ambulate, the note also states that Claimant had developed the pain only one day prior ro her visit. Moreover, the note, dated April 12, 2001, states that Claimant was able to ambulate freely. Therefore, because Claimant's additional evidence is not "new" or "material," this evidence does not require a remand.

### 5. Ineffective Assistance of Counsel

Claimant argues that she should be awarded benefits due to ineffective assistance of counsel. Commissioner counters that, because there is no constitutional right to counsel in a social security disability hearing, the ALJ's decision denying benefits should not be subject to challenge on the grounds that Claimant's attorney rendered ineffective assistance.

Claimant argues that her right to effective assistance of counsel was violated when her attorney failed to: (1) inform Claimant that he "was not pursuing the original suit, but starting a new one"; (2) prepare a procedural outline; (3) "meet, see, or talk with claimant until 5-10 minutes prior to the ALJ Hearing"; and, (4) "note discrepancies between ALJ Decision and the hearing transcript when submitting appeal to Appeal Council." Claimant further alleges that "all counsel interviews, etc., were conducted by a paralegal and only by telephone conversations"; exhibits were lost or misfiled; her counsel quit following the Appeals Council's decision and

failed to submit Claimant's files to Claimant or new counsel in a timely manner.

In a civil actions, Claimant has no constitutionally protected right to effective assistance of counsel. See Sanchez v. U.S. Postal Service, 785 F.2d 1236, 1237 (5th Cir 1986)(sixth amendment right to effective assistance of counsel does not apply to civil proceedings); Nicholson v. Rushen, 767 F.2d 1426, 1427 (9th Cir. 1985)(plaintiff in 1983 action has no constitutional right to effective assistance of counsel). "This rule is based on the presumption that the plaintiff's liberty is not at stake." McDaniel v. Bechtold, No. 86-7253, 1987 WL 37337 at * 1 (4th Cir. April 29, 1987). Accordingly, the circumstances in this case are not sufficient to trigger a due process requirement. Id. See Nicholson, 767 F.2d at 1427. Therefore, the Court finds this claim meritless.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Legal Argument of Federal Plaintiff, which is in the nature of a Motion for Summary Judgment, be DENIED and Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ (1) properly considered Claimant's treating and examining physicians' opinion; (2) gave proper weight to the state agency physicians; and (3) properly determined Claimant's RFC. Additionally, Claimant's additional evidence, which was submitted with her motion, does not warrant a remand. Finally, Claimant's claim of ineffective assistance of counsel is without merit.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to

which objection is made, and the basis for such objection.   A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic case Filing in the Unites States District Court for the Norther District of West Virginia.

DATED: January 6, 2006

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE